## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**JOHN F. MARROW,**                    CASE NO. 3:20 CV 1471

      Plaintiff,

      v.                                   JUDGE JAMES R. KNEPP II

**SSOE, INC.,**

      Defendant.                          **MEMORANDUM OPINION AND ORDER**

### INTRODUCTION

This is a breach of contract case regarding Plaintiff John F. Marrow's resignation from the employment of Defendant SSOE, Inc. Currently pending are fully-briefed cross-motions for summary judgment. Jurisdiction is proper under 28 U.S.C. § 1332. For the reasons discussed below, the Court GRANTS Plaintiff's Motion for Summary Judgment (Doc. 25), and correspondingly DENIES Defendant's Motion for Summary Judgment (Doc. 30).

### BACKGROUND

The underlying facts are not in dispute. Plaintiff worked for Defendant, an engineering/architectural firm, from 2005 through his departure in 2012. He became a Principal in 2010. Between 2007 and 2009, Plaintiff purchased 1,995 shares of SSOE common stock, which was governed by a Stock Redemption Agreement. (Doc. 25-2). Plaintiff paid for these shares with $117,934 in cash and a Cognovit Promissory Note dated December 18, 2009 in the amount of $324,933. *See* Doc. 8 at ¶ 8; Doc. 25-3. The Stock Redemption Agreement provided that in the event of a stockholder's termination of employment, "the Stockholder shall be bound and obligated to sell and the Corporation shall be bound and obligated to purchase all of the

stock owned by said Shareholder." (Doc. 25-2, at ¶ 4(a)). The Agreement provided a method for determining the price of the stock, and the terms of payment, including interest. *See id.* at ¶ 7. As of July 6, 2012, Defendant's stock was valued at $420.37 per share. (Doc. 8, at ¶ 17).[1]

Plaintiff's employment as a Principal of Defendant was governed by an Employment Agreement he signed January 1, 2010. (Doc. 25-1). That agreement contained the following provisions:

> 2.4  <u>Early Retirement or Voluntary Termination</u> – In the event Employee desires to terminate his employment hereunder, or if after attaining the age of fifty-five (55) years he desires to take early retirement, he shall give such advance notice of his intention to do so as is acceptable to the Board of Directors and the date of his intended actual termination of employment, subject, however, to the provision that under no circumstances may the Board of Directors require more than six (6) months' advance notice. Effective date of termination, for purposes of this Paragraph 2.4, shall be the date finally agreed upon between Employee and the Board of Directors as to Employee's date of termination.

* * *

> 2.6  <u>Failure to Give Adequate Notice</u> – Under the circumstances described in Paragraph[] . . . 2.4, Employee is required to give Employer advance notice of Employee's desire to terminate his employment hereunder, or to retire after attaining age 55 years. Employee and Employer agree that these notice requirements are of the utmost importance to Employer, since time will be required for Employer to locate a person to replace Employee and/or it will take Employee time in which to conclude the work which has been assigned to him. It is further agreed that in the event Employee fails to give the required notice, as hereinbefore described, such failure shall be a breach of this Agreement and Employer will be damaged in an amount difficult, if not impossible, to accurately determine. Therefore, Employee agrees that in the event of such a breach, he will pay, as liquidated damages and not as a penalty, an amount equal to twenty five (25%) percent of the amount which Employer is obligated to pay to Employee under the terms and conditions of a certain Stock Redemption Agreement dated March 20, 1970 . . . as amended. In the event the provisions of this Paragraph 2.6 are applicable, the amount which Employee owes to Employer shall be offset against the amount which Employer owes to Employee under the Redemption Agreement, with the result that Employer shall pay to Employee seventy five (75%) percent of the amount to which Employee is entitled under the Redemption Agreement.

---

1. This works out to a total value of $838,638.15 ($420.37 x 1995) on this date.

(Doc. 25-1, at 4-5). Plaintiff also signed a Principals' Non-Solicitation Agreement. (Doc. 30-3). That agreement lacked a specific penalty provision for non-compliance, but stated "breach of any or all of the provisions . . . will result in immediate and irreparable injury to Employer and will allow Employer to have recourse to injunction and/or specific performance to enforce its rights hereunder" and "[t]he obtaining of such equitable relief will not prevent Employer from pursuing any other remedies available to it." *Id.* at 2.

On June 14, 2012, Plaintiff received an offer to be the Chief Operating Officer of The Harris Group's Seattle, Washington office; he accepted the offer the following day. (Plaintiff Depo., at 17-18)[2].

On June 20, 2012, Plaintiff hand-delivered a letter of resignation to Defendant's then-CEO Tony Damon. *Id.* at 20-21. Therein, Plaintiff stated that he was "keen to work with [Damon] and the Board of Directors to agree [to] appropriate notice period arrangements in order to effect as smooth and proper hand-over and succession of my current projects and duties as possible." (Doc. 30-6). Damon recalls Plaintiff also told him he was leaving on vacation in a couple of weeks, and planned to go to Seattle to look for housing and investigate schools for his children. (Damon Aff., Doc. 30-7, at ¶ 4). Damon says he "reminded John of his Non-Solicitation Agreement, as well as the six months' notice of resignation requirement of the SSOE Principal Employment Agreement" and that Plaintiff "acknowledged the Non-Solicitation Agreement, and asked if SSOE would waive the six months' notice of resignation requirement." *Id.* at ¶ 5. Plaintiff disputes that he made such a waiver request. (Plaintiff Depo., at 24-25). Damon agreed to take the issue to Defendant's Board of Directors. *Id.*; Doc. 30-8 (June 26, 2012 email from Damon to Plaintiff stating, *inter alia*, "I will be calling a special Board meeting for

_____

2. Plaintiff's deposition is located at ECF Doc. 28.

purposes of acting on your request to resign your position and waive the 6 month notice required by our employment agreement.").

On June 25, 2012, Plaintiff emailed board member Craig Bowie summarizing his recommendations for transitioning his responsibilities. (Doc. 25-5). He further described suggested timing for his departure, noting he had vacation planned for July 9 – 26, 2012, and "would suggest a couple more weeks after vacation transitioning and handing over (Possibly to 10th August) but that is your call. I am happy to fit in with whatever works best for SSOE." *Id.*

Defendant's Board of Directors held a special meeting on June 29, 2012 to consider Plaintiff's resignation and date of termination. *See* Doc. 30-9. The Board determined they would accept Plaintiff's resignation and "[t]he requirement to provide adequate notice of termination up to 6 months as required by paragraph 2.6 of the Principal Employment Agreement and the associated 25% stock value liquidated damages provision will be deferred and ultimately waived contingent upon [Plaintiff] honoring the terms and conditions of the Principal non-solicitation agreement." *Id.* at 1. It further determined "Jim Jaros will develop a detailed separation agreement incorporating these terms for John's signature". *Id.* at 2.

Shortly thereafter, on July 2, 2012, Monica Dugan, Director of Corporate Human Resources for Defendant, wrote Plaintiff a letter stating, *inter alia*, "[t]he close of the workday on July 6, 2012, is considered the date of termination of employment with SSOE, Inc." (Doc. 25-6); *see also* Doc. 30-13 (email regarding letter). Plaintiff responded to this email the same day and asked if there was any way he could keep his SSOE medical coverage until the end of the month. *See id.*; (Plaintiff Depo., at 48).

4

On July 5, 2012, Plaintiff met with Damon and Dugan. (Damon Aff., Doc. 30-7, at ¶ 8); *see also* Jaros Depo., at 109[3]. At that meeting, they "discussed that July 6, 2012" would be Plaintiff's last day of employment. (Damon Aff., Doc. 30-7, at ¶ 8). Damon presented Plaintiff with a separation agreement, which he said he would have his attorney look over, and they discussed Plaintiff's current work-in-progress. *Id.* Plaintiff agreed to provide a report and market analysis regarding Defendant's South Africa expansion project. *Id.*

The proposed separation agreement, entitled "Agreement to Purchase/Sell Stock and Units and Other Matters Related to Resignation", repeated the part of Paragraph 2.6 of the Employment Agreement regarding adequate notice, and stated Defendant would "hold in escrow the sum of $209,659.64, which is the total amount of the liquidated damages under Paragraph 2.6 of the Employment Agreement", with interest accruing at the Wall Street Journal prime rate as of November 6, 2012. (Doc. 25-7, at 3). The agreement stated that the escrowed amount would be released on July 6, 2016 (four years later) pending compliance with the Employment Agreement, Non-Solicitation Agreement, and Confidentiality Agreement. *Id.* at 4-5. It further stated that "on June 20, 2012, [Plaintiff] submitted a document to [Defendant] under which he notified [Defendant] that such resignation would be effective as an officer as of June 20, 2012 and as an employee as of July 6, 2012." *Id.* at 1. Plaintiff refused to sign the agreement. (Marrow Depo., at 41).

Defendant called the Cognovit Note as of July 6, 2012, Plaintiff's termination date, and Plaintiff paid it in full. (Doc. 8, at ¶¶ 18-20); (Marrow Depo., at 64-66). On July 9, 2012, Plaintiff transferred his shares back to Defendant. *See* Doc. 25-8; Doc. 8, at ¶ 23.

---

3. Jim Jaros's deposition is located at ECF Doc. 27.

Plaintiff provided an email summary regarding the South Africa project to Damon on July 7, but per Damon it was "insufficient, and not what [they] had discussed". (Doc. 30-7, at ¶ 9). Damon emailed Plaintiff on July 31, 2012 stating why he found Plaintiff's response insufficient, and noting that if he did not hear from Plaintiff that day, he would "assume [the] non-response is an indication of your rejection of the separation terms put forth by the SSOE Board of Directors and the matter will go back to the Board on August 2." (Doc. 32-1).

On August 7, 2012, Defendant's Board of Directors held a second special meeting. (Doc. 25-12). The minutes state:

> Following a review and discussion of relevant information regarding [Plaintiff's] job description, duties, responsibilities and work assignment, the Board agreed that, in [Plaintiff's] case, adequate notice" of voluntary termination is no less than 90 days.
>
> In addition, the Board determined that through John's own actions, conduct and behavior he provided a 16 day notice (June 20 through July 6) and, therefore, failed to meet the "adequate notice" requirement in paragraph 2.4 of the Principal Employment Agreement.

*Id.* The Board thereafter agreed to rescind its action from the June 29, 2012 special meeting, find Plaintiff did not provide adequate notice of his resignation, and therefore enforce the liquidated damages provision of Paragraph 2.6 of the Employment Agreement and withhold 25% of the value of Plaintiff's stock. *Id.* This meeting – one month after Plaintiff's termination – was the first time the Board of Directors determined that 90 days was "adequate notice". *See* Jaros Depo., at 86. Plaintiff was not advised of the 90 day notice determined at this meeting, nor was he given an opportunity to comply with it. *Id.* Nor did Defendant ever ask Plaintiff to stay longer than he originally proposed. *Id.* at 44.

Defendant's Federal Civil Rule 30(b)(6) representative, Jaros, further testified that given Plaintiff's position and importance to Defendant's business, no amount of notice would have

been sufficient. *See* Jaros Depo., at 83 ("But, actually, with regard to adequate notice, SSOE was of the opinion it couldn't be met."), 84 ("But once you have a critical person who is critical to your strategy leave, I don't know how adequate notice could be given"), 85 (Q: "What decision was made early on?" A: "That adequate notice was not provided and couldn't be met."). Jaros further testified that all prior Principals to leave the company had given six months' notice, *id.* at 103-04, but Plaintiff was the first to resign, all prior departing Principals left due to retirement, *id.* at 50.

Over time, as provided by the Stock Redemption Agreement, Plaintiff was paid in three installments for his shares of stock; but Defendant withheld $209,659.64 (25% of the total) as liquidated damages. (Jaros Depo., at 91-92); (Doc. 8, at ¶ 26); (Doc. 25-9) (October 2012 email from Damon to Plaintiff setting forth the installment payments and stating that the total of $628,978.62 "constitute[s] 100% of the money owed to you by SSOE.").

## STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of

evidence to support the nonmoving party's case." *Id*. The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials").

DISCUSSION

Plaintiff brings a breach of contract claim, asserting that he complied with the Employment Agreement and Stock Redemption, and therefore Defendant had an obligation to pay him the full value of his stock. Defendant contends it had no such obligation. For the reasons discussed below, the Court finds Plaintiff is entitled to summary judgment.

Reply / Sur-Reply

At the outset, the Court resolves a procedural question. Plaintiff moved to strike Defendant's Reply as untimely. (Doc. 33). Defendant subsequently filed a Motion for Leave to file the brief instanter. (Doc. 34). The Reply was filed one day late, and Defendant represents it was due to inadvertence. *Id.* This Court has repeatedly emphasized substance over form, and will not strike the brief due to a mistaken single-day delay. Plaintiff's Motion to Strike is therefore denied.

Plaintiff alternatively sought leave to file a sur-reply "to address or correct new issues and evidence included in [Defendant's] Reply." (Doc. 33, at 3). Defendant opposed, arguing no new issues were raised in Reply to justify a sur-reply. (Doc. 35). The Court finds Defendant's arguments in Reply are largely an elaboration on the arguments raised in its opening brief. And,

to the extent new arguments are raised, they do not impact the Court's ultimate conclusions herein. As such, Plaintiff's motion for leave to file a sur-reply is also denied.

Breach of Contract

The Court therefore turns to the substance of the pending motions.

In Ohio, "[t]o establish a claim for breach of contract, a plaintiff must prove: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages or loss resulting from the breach." *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 276 (6th Cir. 2019) (citing *Claris, Ltd. v. Hotel Dev. Servs., LLC*, 104 N.E.3d 1076, ¶ 28 (Ohio Ct. App. 2018)). Both parties here point to the other's alleged breach.

The interpretation and construction of a written contract are questions of law. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St. 2d 241 (1978). "The purpose of contract construction is to discover and effectuate the intent of the parties. The intent of the parties is presumed to reside in the language they chose to use in their agreement." *Graham v. Drydock Coal Co.*, 76 Ohio St. 3d 311, 313 (1996). "Contract terms are generally to be given their ordinary meaning when the terms are clear on their face," and courts must "apply the plain language of the contract when the intent of the parties is evident from the clear and unambiguous language in a provision." *Coma Ins. Agency v. Safeco Ins. Co.*, 526 F. App'x 465, 468 (6th Cir. 2013) (citing, *inter alia*, *Karabin v. State Auto. Mut. Ins. Co.*, 10 Ohio St. 3d 163, 166-67 (1984)). "The Ohio Supreme Court has held that extrinsic evidence surrounding a contract may only be considered when the language of the contract is unclear or ambiguous or when the circumstances surrounding the agreement invest the language of the contract with a special meaning." *Waste Mgmt. of Ohio, Inc. v. City of Dayton*, 169 F. App'x 976, 989 (6th Cir. 2006) (citing *Shifrin v. Forest City Enters., Inc.*, 597 N.E.2d 499, 501 (Ohio 1992)).

The Court therefore starts with the plain language of the Employment Agreement. Paragraph 2.4 required:

> [The resigning employee] shall give such advance notice of his intention to do so as is acceptable to the Board of Directors and the date of his intended actual termination of employment, subject, however, to the provision that under no circumstances may the Board of Directors require more than six (6) months' advance notice. Effective date of termination, for purposes of this Paragraph 2.4, shall be the date finally agreed upon between Employee and the Board of Directors as to Employee's date of termination.

(Doc. 25-1, at 4-5).

Defendant reads this provision, combined with the asserted custom and practice of prior departing principals, to *require* six months' advance notice. *See* Doc. 30, at 5; Jaros Depo., at 103-04; Damon Aff., Doc. 30-7, at ¶ 6. Elsewhere, however, it acknowledges the Board – after Plaintiff's termination date – determined that "adequate notice" in Plaintiff's case was 90 days. And Jaros testified that essentially no amount notice would have been adequate. (Jaros Depo., at 83-85, 90-91). Regardless, Defendant asserts Plaintiff failed to give adequate notice as determined by the Board, and the liquidated damages provision in Paragraph 2.6 of the Employment Agreement was properly enforced.

First, Defendant does not argue the contract is ambiguous, nor does the Court find it to be so. As such, it will not consider extrinsic evidence such as the purported "customary" six months' notice from prior principals.

Second, the express language of the Employment Agreement simply cannot support Defendant's interpretation. Rather, it says six months' notice is the *maximum* amount of time the Board may require. To read this language – or look to extrinsic evidence – to *always* require a six-month notice period would contradict the express terms of the contract. This is not permitted. *See Metal Seal Precision, Ltd. v. Good Time Outdoors, Inc.*, 128 N.E.3d 678, 687 (Ohio Ct. App.

2018) ("Where the parties have reached a written agreement that is final with respect to the terms contained in the writing, evidence of prior agreements or contemporaneous oral agreements cannot be used to *contradict* those terms, but extrinsic evidence of trade usage, course of dealing, or course of performance may be used to *explain or supplement* the writing.") (emphasis in original).

Instead, the language of the contract required Plaintiff to provide the Board of Directors with notice of his intent to resign "as is acceptable to the Board", and defined the "effective date of termination" as "the date finally agreed upon between [Plaintiff] and the Board". (Doc. 25-1, at 4-5). Plaintiff attempted to comply. (Doc. 30-6) (resignation letter stating he was "keen to work with [Damon] and the Board of Directors to agree [to] appropriate notice period arrangements in order to effect as smooth and proper hand-over and succession of my current projects and duties as possible.").

The only specific date Plaintiff ever proposed as a departure date was August 10. *See* Doc. 25-5 ("I would suggest a couple more weeks after vacation transitioning and handing over (Possibly to 10th August) but that is your call. I am happy to fit in with whatever works best for SSOE."). The Board accepted Plaintiff's resignation at its July 29, 2012 meeting. (Doc. 25-10, at 1). Defendant determined Plaintiff's last day would be July 6, 2012. (Doc. 25-6); (Doc. 30-13); (Jaros Depo., at 43-44). It did not ask Plaintiff to stay longer. (Jaros Depo., at 44).

The Court finds the plain language of the Employment Agreement expresses an intent that (1) the "acceptable to the Board" notice period will be determined *prior to* the employee's termination date, and (2) the employee's termination date would be a date mutually "agreed upon" between the employee and the Board. *See* Doc. 25-1, at 4-5. Defendant – through its actions – prevented either from happening here. The Court finds the language of the Agreement

11

simply cannot be read to encompass what occurred here – the Board's determination of the appropriate "notice period" after the employee has left employment (on a date determined by the employer), and when the employee could not comply with the Board's notice determination.[4] Defendant thus breached the employment agreement when it determined Plaintiff's employment termination date prior to a determination regarding the "acceptable" notice period. Put differently, Defendant waived any claim regarding inadequate notice when it terminated Plaintiff prior to an "adequate notice" determination. It was therefore not entitled to withhold 25 percent of the value of Plaintiff's stock pursuant to paragraph 2.6 of the Employment Agreement.

There is no dispute that Plaintiff's employment terminated July 6, 2012. At that point, the terms of the Stock Redemption Agreement controlled. That Agreement required that in the event of a stockholder's termination of employment, "the Stockholder shall be bound and obligated to sell and the Corporation shall be bound and obligated to purchase all of the stock owned by said Stockholder." (Doc. 25-2, at ¶ 4(a)). Plaintiff complied, Defendant did not. Defendant called the Cognovit Note on Plaintiff's termination date, and Plaintiff paid it in full. (Doc. 8, at ¶¶ 18-20); (Marrow Depo., at 64-66). On July 9, 2012, Plaintiff transferred his shares back to Defendant as required by the Stock Redemption Agreement. *See* Doc. 25-8; Doc. 8, at ¶ 23. The Stock Redemption Agreement provided for payment of the full value of a departing employee's stock. *See* Doc. 25-2, at ¶ 4.

Defendant contends Plaintiff is wrongly seeking to belatedly obtain the benefit of a bargain he previously rejected – the Separation Agreement. But this is not so. Plaintiff's employment, and entitlements upon termination of that employment, were governed by the

---

4. Defendant retroactively calculated the notice Plaintiff "provided" as running for sixteen days from the date of his notice of resignation to the date Defendant itself established as his termination date. *See*  Doc. 25-12, at 1. This is borderline nonsensical as Plaintiff cannot provide a period of notice to a date he did not set.

Employment Agreement and the Stock Redemption Agreement. That Plaintiff refused to sign a proposed, subsequent, materially different agreement does not change the fact that he is entitled to the benefit of the bargain he and Defendant mutually agreed to – that set forth in the Employment Agreement and Stock Redemption Agreement.

Defendant makes much of Plaintiff's vacation and Plaintiff's importance to certain of Defendant's projects. But even if Defendant is correct that the facts demonstrate "it is clear that Marrow wanted to, and in fact did, commence work for his new employer immediately upon his return from vacation" (Doc. 30, at 10), these facts are immaterial to the breach of contract determination where Plaintiff did not breach any contract term. Plaintiff's desires before – or actions after – Defendant breached the Employment Agreement are not relevant.[5] Nor does the Court find material Defendant's arguments regarding the harm Plaintiff's departure caused Defendant. The possibility of such harm was contemplated by the Employment Agreement. *See* Doc. 25-1, at 5 ("Employee and Employer agree that these notice requirements are of the utmost importance to Employer, since time will be required for Employer to locate a person to replace Employee and/or it will take Employee time in which to conclude the work which has been assigned to him."). But when Defendant terminated Plaintiff's employment prior to determining an adequate notice period, it breached the terms of that agreement and lost the benefit of that bargain. Moreover, Defendant brought any harm created by a shortened departure period upon itself when it chose to ask Plaintiff to leave promptly, rather than to stay on.

For these reasons, the Court finds Plaintiff is entitled to summary judgment on his breach of contract claim and is entitled to the full value of the stock he sold back to Defendant upon his

---

5. So too the Court finds Defendant's argument regarding Plaintiff's use of paid time off ("PTO") after notice of termination as a contractual violation unpersuasive. As Plaintiff points out, his vacation did not occur until after his termination date.

resignation. Thus, Plaintiff is entitled to the $209,659.64 that was improperly withheld, with interest as provided by the Stock Redemption Agreement.[6]

Laches

Defendant contends Plaintiff's claim – even if valid – is barred by laches. Plaintiff responds that laches is an equitable defense not available to a purely legal claim, and even if applicable, the contractual interest cited by Defendant does not amount to the prejudice required to assert such a defense.

"The elements of laches are (1) unreasonable delay or lapse of time in asserting a right, (2) absence of an excuse for such a delay, (3) knowledge-actual or constructive-of the injury or wrong, and (4) prejudice to the other party." *Martin Marietta Magnesia Specialties, L.L.C. v. Pub. Util. Comm.*, 129 Ohio St. 3d 485, 495 (Ohio 2011) (citing *State ex rel. Cater v. N. Olmsted*, 69 Ohio St. 3d 315, 325 (1994)). "Only upon a clear showing of special circumstances, may the defense of laches be asserted prior to the expiration of the statute of limitations." *Coen v. Stow Retail Park Co.*, 1991 WL 122902, at *2 (Ohio Ct. App).[7]

Defendant cannot establish the fourth element and thus laches does not bar Plaintiff's breach of contract claim. As prejudice resulting from Plaintiff's delay, Defendant cites only interest on the base amount owed. *See* Doc. 30, at 14-15.[8] The Stock Redemption Agreement itself provides for interest on the stock buyout payments. *See* Doc. 25-2, at ¶ 7; *see also*

---

6. Per the Stock Redemption Agreement: "In addition the unpaid balance of the purchase price shall bear interest at an annual rate equal to the Wall Street Journal prime rate for the month preceding the month in which each of the installments are due. Interest shall be paid at the same time and in addition to the payment of the installment of the purchase price." (Doc. 25-2, at ¶ 7).
7. Defendant has not asserted a statute of limitations defense in this case.
8. Defendant's Reply again focuses on the temporal delay between the accrual of Plaintiff's claim and his filing of this suit, but does not identify anything specific as "prejudice". And "delay in and of itself in asserting a right does not constitute laches—length of time alone is insufficient to constitute a material prejudice." *Connin v. Bailey*, 15 Ohio St. 3d 34, 36 (1984).

Complaint, Doc. 1, at ¶ 29 (asserting "SSOE refused and continues to refuse to pay Marrow for the remaining 25% of his shares, totaling $209,659.64, plus interest from November 2012, as required by the Stock Redemption Agreement.").

Ohio courts hold that interest on an amount due pursuant to a contract does not satisfy the "prejudice" requirement of a laches defense. *See Thirty-Four Corp. v. Sixty-Seven Corp.*, 15 Ohio St. 3d 350, 353 (1984) ("We do not believe that the accumulation of interest and the absence of a timely demand for payment constitute material prejudice."); *Gordon v. Reid*, 2014 WL 5409197, at *5 (Ohio Ct. App.) ("The accumulation of interest and the absence of a timely demand for payment does not constitute material prejudice where the terms of the debt are set forth in the contract.") (quotation and citation omitted).

Therefore, setting aside the arguments about whether laches applies to these circumstances, and whether the other elements are established, Defendant cannot succeed on its laches defense because it has not pointed to material prejudice.

Bad Faith

Finally, Plaintiff asks this Court to award attorney's fees due to Defendant's bad faith. For the following reasons, the Court declines to do so.

"In Ohio, a prevailing party in a civil action may not recover attorney fees unless provided for by contract or statute or when the prevailing party proves bad faith on the part of the unsuccessful party." *Simpkins v. Grace Brethren Church*, 149 Ohio St. 3d 307, 315 (Ohio 2016); *see also Stambaugh v. T.C. Wood Realty, Inc*., 2010 WL 3190775, at *5 (Ohio Ct. App.) ("Ohio follows the American rule which provides in a breach of contract case each party is responsible for their own attorney fees except as otherwise provided for by statute or contract or when the

opposing party acted in bad faith, vexatiously, wantonly, obdurately, for malicious reasons or otherwise engaged in malicious conduct.").

Plaintiff contends Defendant retained the liquidated damages at issue here as punishment for Plaintiff's refusal to sign the Separation Agreement and this amounts to bad faith. He cites Damon's notes regarding a July 30, 2012 conference call with Plaintiff, in which the parties discussed the proposed Separation Agreement. Damon wrote:

> Tony reminded John that, should John cho[o]se to pursue this matter through litigation, it could likely take 3 to 4 years and be very costly both financially and emotionally. Under the terms of the Board's offer, John can receive all the monies he feels are due him, plus interest.
>
> Tony reminded John that absent a response from him by close of business on July 31, 2012, Tony would be forced to take this matter back to the Board at its August 2, 2012 meeting, to determine how the Board would like to proceed.

(Doc. 31-2, at 2). Plaintiff contends Defendant "executed its threat" after his refusal to sign when the Board of Directors made a *post hoc* determination that his notice was inadequate and thus improperly withheld 25% of the value of his stock as punishment. (Doc. 31, at 18).

Defendant disputes that any action was taken to punish Plaintiff and contends "[t]his is a simple breach of contract case and nothing more." (Doc. 32, at 10). It characterizes Damon's statements as "nothing more than a statement of the realities of litigation." *Id.* at 9.

The Court agrees with Defendant that Damon's statements, taken alone, are certainly not sufficient to demonstrate bad faith. But the Court does not have only Damon's statements. It has the testimony of Jaros, Defendant 30(b)(6) representative[9] that Defendant decided no amount of

---

9. "A Rule 30(b)(6) witness differs from a 'mere corporate employee' because, unlike an individual witness, the testimony of a Rule 30(b)(6) witness represents the knowledge of the corporation and testimony under the rule binds the corporation." *Edwards v. Scripps Media, Inc.*, 331 F.R.D. 116, 121 (E.D. Mich. 2019) (quoting *White v. Wal-Mart Stores E., L.P.*, 2018 WL 5083891, at *3 (W.D. Ky.)).

notice was sufficient for Plaintiff to have provided and that it would therefore withhold 25% of

his stock value:

> **Q:** Did SSOE ever give John Marrow an opportunity to comply with the 90-day adequate notice provision or determination?
>
> **A:** You saw that they did through various correspondence. They were working with John. But, actually, with regard to adequate notice, SSOE was of the opinion it couldn't be met. . . . .
>
> But once you have a critical person who is critical to your strategy leave. I don't know how adequate notice could be given. If he'd said he'd give us a year, I just don't know how – I can't envision how you would structure that working relationship when you know someone's going to a potential competitor.
>
> **Q:** So the board of directors, through [Damon] and [Dugan] and these communications, I want to understand.
>
> It's your testimony the board of directors made clear to Marrow that unless he signs the proposed separation agreement, the board would retroactively determine that his notice was inadequate and retain 25 percent of the value of the stock he owned in SSOE.
>
> **[Mr. Davis]:** Objection to form and foundation.
>
> **A:** Yeah. I would more or less state it that not retroactively; in effect, the determination was made, but it was just deferred pending working out an agreement.
>
> So it just executed a decision that was made early on.
>
> **Q:** What decision was made early on?
>
> **A:** That adequate notice was not provided and couldn't be met.
>
> * * *
>
> **Q:** And you agree with me that SSOE never gave John Marrow any opportunity to comply with its 90 day advance notice determination, adequate notice determination?
>
> **A:** Again, I've answered that earlier. I said that 90 days was irrelevant to me. Whether it was 60 days, 90 days, 180 days, adequate notice couldn't have been provided under this fact pattern.

> **Q:** And so, in effect, the contract terms don't matter. The board just determined because of his importance, it was entitled to determine whether it could retain a portion of his equity?
>
> **[Mr. Davis]:** Objection.
>
> **A:** Yes.
>
> **Q:** Your answer was yes?
>
> **A:** Yes. But the board wasn't going to - - yes, but, because the board wasn't going to just retain his equity, they were going to escrow it. But that was rejected.

(Jaros Depo., at 83-85, 90-91).

In this testimony, and in its briefing, Defendant thus admits that it decided to withhold 25% of the value of Plaintiff's stock because he refused to sign the Separation Agreement. *See* Doc. 30, at 17 ("Knowing that Defendant SSOE would only waive the 'adequate notice' provision contingent upon Plaintiff's signing a Separation Agreement, Plaintiff refused to do so, and was therefore appropriately assessed the liquidated damages of his Employment Agreement."); Doc. 32, at 10 ("SSOE agreed to waive the six (6) months' notice in exchange for Marrow entering into a Separation Agreement which he refused to do, and was thus appropriately subjected to the liquidated damages provision of his Employment Agreement."). As set forth above, (1) the Employment Agreement did not contain a six-month notice requirement; (2) Defendant lost the benefit of the "adequate notice" requirement when it failed to determine such notice period *prior to* Plaintiff's termination, and (3) nothing required Plaintiff to sign the Separation Agreement, which set forth different terms than the documents governing his employment and payment upon termination (the Employment Agreement and Stock Redemption Agreement).

Even so, however, the Court finds Defendant's actions do not rise to the level of bad faith as is required to deviate from the standard "American Rule" that each party is responsible for his own attorney fees. Some Ohio courts awarding attorneys' fees under the bad faith exception have applied the following definition:

> A lack of good faith is the equivalent of bad faith, and bad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another.

*LEH Props., Inc. v. Pheasant Run Ass'n.*, 2011-Ohio-516, ¶ 23 (Ohio Ct. App. 2011) (quoting *Zaychek v. Nationwide Mut. Ins. Co.*, 2007-Ohio-3297, ¶ 18 (Ohio Ct. App. 2007)). "Moral obliquity means a deviation in one's behavior from the principles of right and wrong or from moral integrity and righteousness." *Dodson v. Maines*, 2012-Ohio-2548, ¶ 41 (Ohio Ct. App.). But even intent to breach an agreement does not demonstrate bad faith. *E.g.*, *Strategy Group for Media, Inc. v. Lowden*, 2013 WL 1343614 (Ohio Ct. App.) (holding that mere refusal to perform a contractual obligation of paying amount due on invoices is insufficient to demonstrate bad faith).

It is apparent that Defendant was disappointed with Plaintiff's departure, and likely suffered a loss of business as a result thereof. It tried to find a way to apply the terms of the agreements governing Plaintiff's employment in a seeming attempt to mitigate some of that damage, including attempting to persuade Plaintiff to sign a new agreement providing more ability to enforce its non-solicitation agreement. But "[b]ad faith is not just bad judgment". *O'Brien v. Shorey*, 2021-Ohio-2519, ¶ 27 (Ohio Ct. App.). And this case lacks several elements that Ohio Courts have pointed to as evidence of a party's bad faith.

First, there is no evidence Defendant entered into Plaintiff's employment agreement with the intent not to honor its terms, which is "the essence of bad faith". *Hall v. Franz*, 2000 WL 670662 (Ohio Ct. App.) (party admitted that he entered into a settlement agreement with intent not to honor it); *see also Columbus Med. Equip. v. Waiters*, 468 N.E.2d 343, 348 (Ohio Ct. App. 1983) (party signed employment contract "with no intention of complying with [its] restrictive covenants").

Second, "[a]nother element missing from the evidence of bad faith cited . . . is vengefulness, or a desire to do the non-breaching party harm." *Avis Rent A Car Sys.*, *LLC v. City of Dayton*, 2015 WL5636897, at *12 (S.D. Ohio) (citing, *inter alia*, *LEH Props.*, 2011 WL 378783, at *6-7, for the proposition that bad faith encompasses a party that "gave shifting reasons for its nonperformance, but the delay was actually intended to force the non-breaching party into financial ruin"); *see also Dodson v. Maines*, 2012-Ohio-2548, at ¶ 27 (Ohio Ct. App) (attorneys' fees based on bad faith appropriate where father breached agreement with daughter to punish her for her sexual decisions and abortion).

Defendant here thought it could determine the appropriate notice period after Plaintiff's termination date based on the Board's June 29, 2012 determination that it was deferring a decision regarding adequate notice and that such decision could be contingent upon Plaintiff signing a separation agreement. For the reasons set forth above, Defendant was incorrect to think it could apply the contractual terms this way. But that incorrect determination does not amount to bad faith. As the *Avis Car System, LLC* court explained: "There is no question that Plaintiff[] [was] harmed by the [Defendant's] breach. However, all breaches work a harm on the non-breaching party, and a breach alone is not conscious wrongdoing." 2015 WL 5636897, at *14. That is, even though Defendant ultimately loses its contractual argument, the Court finds its

actions in breaching the contract do not amount to the "dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud" necessary to amount to bad faith. *LEH Props.*, 201-Ohio-516, ¶ 23. As such, Plaintiff is not entitled to attorney's fees.

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Plaintiff's Motion for Leave to File a Sur-Reply (Doc. 33), be and the same hereby is, DENIED; and it is

ORDERED that Defendant's Motion for Leave to File Reply Instanter (Doc. 34), be and the same hereby is, GRANTED;

ORDERED that Plaintiff's Motion for Summary Judgment (Doc. 25) be, and the same hereby is, GRANTED in part and denied in part as described herein; and it is

FURTHER ORDERED that Defendant's Cross-Motion for Summary Judgment (Doc. 30) be, and the same hereby is, DENIED.

 s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE